UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------X
In re:                                   :          Chapter 11
                                         :
THE NEW YORK INTERNET CO., INC.          :
                                         :          Case No. 17-10326 (SHL)
                            Debtor.      :
-------------------------------------------------------X
THE NEW YORK INTERNET CO., INC.          :
                                         :
                            Plaintiff,   :
                                         :
           -against-                     :          Adv. Proc. No. 17-01045 (SHL)
                                         :
JOBDIVA INCORPORATED,                    :
                                         :
                            Defendant.   :
-------------------------------------------------------X
```

<u>**MEMORANDUM OF DECISION**</u>


**A P P E A R A N C E S :**

**CHARLES E. BOULBOL, PC**
*Counsel for The New York Internet Co., Inc.*
26 Broadway, 17th Floor
New York, NY 10004
By:     Charles E. Boulbol, Esq.

**MATALON SHWERKY ELMAN PLLC**
*Counsel for JobDiva Inc.*
450 Seventh Avenue, 33rd Floor
New York, NY 10123
By:     Howard I. Elman, Esq.
        Yelena Rapoport, Esq.

**SEAN H. LANE,**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the motion filed by JobDiva Inc. (the "Defendant" or "JobDiva")

seeking dismissal of the complaint filed by The New York Internet Company, Inc. (the

"Plaintiff" or "NYI"). *See generally Defendant's Memorandum of Law in Support of Its Motion*

*to Dismiss the Complaint* (the "Motion") [ECF No. 1-19].[1]  For the reasons stated below, the

Court grants the Motion in part and denies the Motion in part.

## BACKGROUND

Plaintiff is in the business of providing various internet-related services to third parties

and operates a data center located at 100 William Street, New York, New York 10038 (the "Data

Center").  Complaint ¶ 3 [ECF No. 1-2].

On November 18, 2011, NYI and JobDiva entered into a Server Colocation Agreement

(the "SCA") (Complaint Ex. A) [ECF No. 1-3] pursuant to which NYI agreed to provide, and

JobDiva agreed to pay for, server colocation services for an initial term commencing on October

25, 2011 and continuing through October 24, 2013 ("Initial Term").[2]  SCA at 1, § 4.01.  By its

terms, the SCA automatically renewed for successive one-year periods unless either party

exercised its right to terminate on at least 90 days' notice before the expiration of the then-

current term.  *Id.* § 4.01.  Importantly, the SCA provided that it could "be modified only by a

written agreement of modification signed by *all of the parties hereto*."  *Id.* § 8.08 (emphasis

added).

The SCA set forth general terms governing the parties' transactions, including

confidentiality obligations (*see id.* Art. V), indemnification obligations (*see id.* § 7.01), and the

governing law—that of New York (*see id.* § 8.01).  But the SCA did not contain a specific list of

---

[1]     Unless otherwise specified, references to the Case Management/Electronic Case Filing ("ECF") docket are to Case No. 17-01045.

Because the action underlying this adversary proceeding was transferred from the Supreme Court of the State of New York, this Court's first docket entry is an aggregate of the entirety of the State Court docket.  For clarity, sub-items of ECF No. 1 will therefore be identified by the nature or name of the original filing when first referenced.

[2]     Defendant states in the Motion that the parties had prior business dealings and contractual arrangements, but these are not at issue in this adversary proceeding.  *See Motion* at 3 ("Beginning in 2005, NYI provided various hosting (or 'colocation') services to JobDiva.").

services or quantity of space to be provided by NYI, or prices for such items; rather, it contemplated that the parties would enter into separate agreements in the form of service orders for specific services. *See id.* §§ 2.01(c), 2.04. The SCA provided that NYI had a right to terminate any service order and that service orders could expire or terminate by their own terms. *See id.* § 2.03. The SCA stated that, at JobDiva's request, NYI could also provide other services in connection with installing, maintaining, or disconnecting JobDiva's equipment, at the rates and under the terms set forth in separate service orders. *See id.* § 2.01(c). The SCA further provided that the initial set-up fees, monthly capacity rates, and colocation rates were set by a service order dated October 31, 2011 (the "October 2011 Order") (Complaint Ex. B) [ECF No. 1-4], which was incorporated explicitly into the SCA. *See* SCA § 3.01.

Between October 2011 and April 2016, NYI and JobDiva entered into more than a dozen service orders, pursuant to which NYI agreed to provide colocation services to JobDiva in exchange for both stand-alone and monthly recurring charges. *See* Complaint ¶¶ 4–8; *id.* Exs. B–E [ECF Nos. 1-4, 1-5, 1-6, 1-7]; *Affidavit of Charbel Rouhana in Support of Defendant's Motion to Dismiss the Complaint* ("Charbel Affidavit") Ex. 3 [ECF No. 1-23].[3] Each service order contained its own duration provisions. For example, the October 2011 Order required acceptance by JobDiva of a "2 Year Contract" (October 2011 Order at 1–2), while another service order dated October 30, 2013 required a "36 Month Contract" (the "October 2013 Order") (Complaint Ex. C at 1–2). Several other service orders were designated as "Co-Terminus" with the SCA (*see, e.g.,* Charbel Affidavit Ex. 3 at 7, 9, 10); some carried a "Month to Month Term" (*see, e.g.,* Complaint Ex. E at 1, 4, 7); and still others included no specific term

---

[3]    Defendant submitted more service orders in support of the Motion than were included in the exhibits to the Complaint. As explained more fully below, the Motion requires that the Court evaluate the allegations of the Complaint. The Court cites to the Motion and pleadings other than the Complaint solely to summarize the parties' arguments and provide background that is not in dispute.

but merely provided for "Non Recurring Charges" or "Monthly Recurring Charges" (*see, e.g., id.* Ex. E at 19–21). None of the service orders were signed by a representative of NYI; instead, all were signed by only a representative of JobDiva, or by no one at all. *See* Complaint Exs. B–E.

In 2014, NYI sought to amend the SCA with a service order form that proposed to extend the SCA from September 25, 2014 through September 24, 2017 (the "Purported 2014 Addendum") (Complaint Ex. D) [ECF No. 1-6). JobDiva's Vice President of Technology signed the Purported 2014 Addendum on November 20, 2014, but NYI itself never signed the document. *Id.* In July 2016, after approximately two years of the three-year extension contemplated by the Purported 2014 Addendum, JobDiva notified NYI in writing that JobDiva was terminating the SCA as of October 24, 2016 (the "Termination Letter") (Complaint Ex. F) [ECF No. 1-8). A few days later, NYI sent JobDiva a letter objecting to JobDiva's termination notice, and stating that Defendant had no right to terminate the SCA prior to September 24, 2017. Complaint Ex. G [ECF No. 1-9). On October 16, November 16, and December 16, 2016, NYI submitted invoices to JobDiva in accordance with the terms of the SCA, each seeking payment of monthly recurring charges in the amount of $92,118.50 (the "Invoices") (Complaint Exs. H, J, K) [ECF Nos. 1-10, 1-12, 1-13].

During the month of October 2016, JobDiva attempted to remove all of its equipment from the Data Center (Complaint ¶ 14), but JobDiva alleges that NYI would not allow it to complete the task until February 2017 (Motion at 6). The parties disagree on whether JobDiva paid the associated disconnection, removal services, and freight elevator charges. *Compare* Complaint ¶ 14 (stating that "no part" of the elevator charges had been paid), *with* Motion at 6–7 nn. 2, 3 (asserting that Defendant paid the elevator fees on January 23, 2017).

4

On December 21, 2016, NYI commenced an action against JobDiva in the Supreme Court of New York, County of New York.  *See The New York Internet Co., Inc. v. JobDiva, Inc.*, Index No. 656678/2016 (Sup. Ct. N.Y. Cnty.); *see also* Complaint.  In the Complaint, NYI argues that its Purported 2014 Addendum extended the SCA through September 24, 2017, and that the Termination Letter and subsequent removal of Defendant's equipment from the Data Center in October 2016 constituted a breach and anticipatory repudiation of the SCA and Purported 2014 Addendum.  *See* Complaint ¶¶ 4–25.  Under its first cause of action for breach of contract, Plaintiff seeks damages of $280,855.50 plus interest, which is the sum of the Invoices issued October through December 2016.[4]  *See* Complaint ¶ 17, at 5.  Plaintiff's second cause of action for anticipatory repudiation seeks $1,017,803.50 in monthly recurring charges for the months of November 2016 through September 2017.  *See id.* ¶¶ 23–25, at 5.

NYI filed for Chapter 11 relief in this Court on February 14, 2017, two months after filing the Complaint in New York State Court.  *See Voluntary Petition* [Case No. 17-10326, ECF No. 1].  A few days later, JobDiva filed its Motion to dismiss the State Court action arguing that the SCA was not validly extended by the Purported 2014 Addendum.  *See* Motion at 2, 8–10.  JobDiva's Motion further contends that, even if validly extended, the SCA did not itself establish any specific payment obligations for services or use of the Data Center, and all service orders were either terminated by the Termination Letter or expired on their own terms.  *See id.* at 2–3, 9, 10–13.  NYI removed the State Court action to this Court a little more than a month later and the Motion to dismiss came with it.  *See The New York Internet Co., Inc. v. JobDiva, Inc.* Case No. 1:17-cv-02002 (S.D.N.Y.).  The Court held a hearing on the Motion on October 5, 2017.

---

[4]      Plaintiff's claim also includes $4,500 for freight elevator fees.  *See* Complaint ¶ 14.  JobDiva alleges it did not receive any invoice for those fees until after the Complaint was served, and claims to have already paid the fees in January 2017.  *See* Motion at 6–7 nn. 2, 3.

## DISCUSSION

### A. Applicable Standards

#### 1. Motion to Dismiss

"It is well settled that when a case has been removed to this Court from the state court, federal [procedural] law is applied as though the action was originally commenced here." *Leadsinger, Inc. v. Cole*, 2006 WL 2266312, at *10 (S.D.N.Y. Aug. 4, 2006) (quoting *Rabbi Jacob Joseph School v. Province of Mendoza,* 342 F. Supp. 2d 124, 127 (E.D.N.Y. 2004)) (alteration in original); *see* Fed. R. Civ. P. 81(c)(1) ("These rules apply to a civil action after it is removed from a state court."); *G.G.G. Pizza, Inc. v. Domino's Pizza, Inc.*, 67 F. Supp. 2d 99, 101–02 (E.D.N.Y. 1999) ("After the removal of an action from state court, ... [t]he case will proceed as if it had been brought in the federal court originally.  Thus, . . . the removed case will be governed according to the Federal Rules of Civil Procedure . . . .") (quoting 14C Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 3738, at 390–91 (1998)) (first omission in original).

While Defendant filed this Motion under Rule 3211(a)(7) of the New York Civil Practice Law and Rules, the Court considers it as a motion to dismiss for failure "to state a cause of action" under Federal Rule of Civil Procedure 12(b)(6).[5]  *See* Fed. R. Civ. P. 12(b)(6) (establishing as grounds for dismissal the "failure to state a claim upon which relief can be granted"); *Perry v. Safeco*, 2017 WL 655172, at *1 n. 2 (E.D. Va. Feb. 16, 2017) (holding that "after removal, the demurrer filed in state court [would] be treated as the federal equivalent—a

---

[5]     Defendant also filed its Motion pursuant to Rule 3211(a)(1), which permits a motion to dismiss on the grounds that a defense exists that is "founded on documentary evidence."  N.Y. C.P.L.R. 3211 (McKinney).  The Court finds the Rule 3211(a)(1) motion to be functionally identical to the 3211(a)(7) motion, as Defendant is relying solely on the "documentary evidence" defense to argue that "the complaint and documentary evidence [attached or cited by the Complaint] show that NYI has failed to allege, and cannot prove, any breach—a required element of a contract claim."  Motion at 7.

motion to dismiss for failure to state a claim . . ." pursuant to Federal Rule of Civil Procedure

12(b)(6)); *see also Rubeor v. Town of Wright*, 191 F. Supp. 3d 198, 203 n. 2 (N.D.N.Y. 2016)

("Although Plaintiff's pleadings were originally filed in state court, federal pleading standards

apply post-removal.") (citations omitted); *Pena v. City of Rio Grande City*, 879 F.3d 613, 617

(5th Cir. 2018) (holding that federal "plausibility" standard applied to pleadings made in state

court after removal); *Pillitieri v. City of Flagler Beach*, 2017 WL 3840433, at *2 n. 3 (M.D. Fla.

Sept. 1, 2017) (siding with the "majority of courts" to find that "federal pleading standards apply

to removed complaints"); *c.f. Parker v. Hijuelos*, 1991 WL 158976, at *1 (E.D.N.Y. July 15,

1991) (explaining how after removal from state court, certain defendants "restated" their prior

motion to dismiss "pursuant to CPLR 3211(a)(7)" as a motion to dismiss pursuant to Federal

Rules of Civil Procedure 12(b)(6) and 12(c)).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient

facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 US 662, 678

(2009). A claim has facial plausibility when the court may reasonably infer that the defendant is

liable for the misconduct alleged. *See Iqbal*, 556 US at 678; *see also Bell Atlantic Corp. v.

Twombly,* 550 U.S. 544, 556. A pleading offering only "labels and conclusions" or "a formulaic

recitation of the elements of a cause of action," however, "will not do." *Twombly,* 550 U.S. at

555; *see Rothstein v. UBS AG,* 708 F.3d 82, 94 (2d Cir. 2013) (discrediting "legal conclusions

couched as factual allegations"). In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the

court must accept as true all factual allegations in the complaint, drawing all reasonable

inferences in favor of the plaintiff. *See BG Litig. Recovery I, LLC v. Barrick Gold Corp.*, 180 F.

Supp. 3d 316, 320 (S.D.N.Y. 2016). In sum, the court must determine whether the "well-pleaded

factual allegations," assumed to be true, "plausibly give rise to an entitlement to relief." *Iqbal,* 556 U.S. at 679.

Plaintiff created a procedural wrinkle by relying upon new evidence—not referenced or attached to the Complaint—in the form of a series of emails between the parties from around the time of the Purported 2014 Addendum. *See Affidavit in Opposition To Motion to Dismiss* (the "Opposing Affidavit") ¶¶ 24–26, Exs. A–D [ECF No. 12]; *Memorandum of Law in Opposition to Motion to Dismiss Complaint* (the "Opposing Memo") at 6 [ECF No. 11]. Although Plaintiff argues that New York state procedural rules allow reference to such additional documentary evidence on a motion to dismiss, federal procedures do not. Indeed, "'[c]ourts in this Circuit have made clear that a plaintiff may not shore up a deficient complaint through extrinsic documents submitted in opposition to a defendant's motion to dismiss.'" *Elliott v. Nestle Waters N. Am. Inc.*, 2014 WL 1795297, at *7 (S.D.N.Y. May 6, 2014) (quoting *Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria,* 265 F.R.D. 106, 122–23 (S.D.N.Y. 2010)) (alteration in original). "In assessing the sufficiency of the complaint" under a 12(b)(6) motion, "a court may consider 'any written instrument attached to [the complaint] as an exhibit, materials incorporated in it by reference, and documents that . . . are integral to the complaint.'" *Clopay Plastic Prod. Co. v. Excelsior Packaging Grp., Inc.*, 2013 WL 6388444, at *2 (S.D.N.Y. Dec. 6, 2013) (quoting *Sira v. Morton,* 380 F.3d 57, 67 (2d Cir. 2004)); *see also Lilac Grp.-W Scranton Corp. v. Wells Fargo Bank, NA*, 2017 WL 1192892, at *7 (S.D.N.Y. Mar. 29, 2017). "Whether a document is attached to a complaint is self evident." *Madu*, 265 F.R.D. at 123 (citing *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991)). "To be incorporated by reference, the complaint must make 'a clear, definite and substantial reference to the documents.'" *Id. (quoting Helprin v. Harcourt, Inc.,* 277 F. Supp. 2d 327, 330–31 (S.D.N.Y.

2003)).  Finally, "to be integral to a complaint, the plaintiff must have (1) 'actual notice' of the extraneous information and (2) 'relied upon th[e] documents in framing the complaint.'"  *Id.* (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)) (alteration in original).

The emails appended to the Plaintiff's Opposing Affidavit fall well short of this three-part standard.  Plaintiff did not attach the emails to its Complaint, nor did it discuss, quote, mention, or even rely upon them by implication.  *Compare Madu*, 265 F.R.D. at 124 (rejecting reliance on emails in a motion to dismiss where "[n]ot only does the complaint lack any quotations from the e-mails, it fails even to include the term 'e-mail.'"), *with Clopay Plastic*, 2013 WL 6388444, at *5 (permitting reliance on writing where third-party plaintiff not only "alleged the general existence of ratification 'verbally and in writing,'" but also specifically pointed to writings within a certain date range).  Rather, the correspondence was introduced *only* as a response to Defendant's contention that the Purported 2014 Addendum was not validly executed as a modification of the SCA.

The Court has two options in this situation.  "When additional materials are submitted to the Court for consideration with a 12(b)(6) motion, the Court must either exclude the additional materials and decide the motion based solely upon the complaint, or convert the motion to one for summary judgment under Fed.R.Civ.P. 56."  *Amadsau v. Bronx Lebanon Hosp. Ctr.*, 2005 WL 121746, at *3 n. 7 (S.D.N.Y. Jan. 21, 2005) (citations omitted).  At the hearing on the Motion, the Court asked the parties whether it should review the Motion under Rule 12(b)(6) or under Rule 56 as a motion for summary judgment.  The parties expressed no preference.  Because no discovery has taken place and only one party has submitted additional evidence—in reliance on state procedural rules that no longer apply—the Court declines to convert to a motion

9

for summary judgment, and instead proceeds under Rule 12(b)(6).  This result dictates that the emails attached to the Opposing Affidavit be excluded from the Court's consideration of the pending Motion.

### 2. <u>Contract Construction</u>

The SCA is governed by New York law under its terms.  SCA § 8.01.  "Under New York law, the elements of a breach of contract claim are (1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages."  *Breathe LLC v. White Fox Ventures, Inc.*, 268 F. Supp. 3d 510, 513 (S.D.N.Y. 2017).  Likewise "[u]nder New York law, '[t]he initial interpretation of a contract is a matter of law for the court to decide.'"  *Wells Fargo Bank, Nat. Ass'n v. Davidson Kempner Capital Mgmt. LLC*, 32 F. Supp. 3d 436, 443 (S.D.N.Y. 2014) (quoting *Yakin v. Tyler Hill Corp., 566 F.3d 72, 75 (2d Cir. 2009)).  "In reviewing a motion to dismiss a breach of contract claim pursuant to Rule 12(b)(6), the Court may interpret a contract properly before it and . . . is 'not constrained to accept the allegations of the [pleading] in respect of the construction of the [contract].'"  *Gerdau Ameristeel U.S. Inc. v. Ameron Int'l Corp.*, 2014 WL 3639176, at *3 (S.D.N.Y. July 22, 2014) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. and Tel. Co.,* 62 F.3d 69, 72 (2d Cir. 1995)) (alterations in original).

Analysis of a breach of contract claim begins with the contract's language.  *See Crowley v. VisionMaker, LLC*, 512 F. Supp. 2d 144, 152 (S.D.N.Y. 2007) ("'In reviewing a written contract' . . . the court 'ordinarily looks only at the wording used by the drafters who presumably understood what they intended.'") (quoting *Seiden Assocs., Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 426, 428 (2d Cir. 1992)).  A motion to dismiss may be granted "[w]here a contract's language is clear and unambiguous."  *Oppenheimer & Co. v. Trans Energy, Inc.,* 946 F. Supp. 2d

343, 349 (S.D.N.Y. 2013) (citing *Advanced Mktg. Grp., Inc. v. Bus. Payment Sys., LLC,* 300 F.

App'x 48, 49 (2d Cir. 2008)); *see, e.g., OBG Tech. Servs., Inc. v. Northrop Grumman Space &*

*Mission Sys. Corp.*, 503 F. Supp. 2d 490, 514–17 (D. Conn. 2007) (granting defendant's motion

to dismiss a breach of contract claim after finding that "the plain language of the [contract] [did]

not comport" with plaintiff's claim).  "[I]f a contract is ambiguous as applied to [the facts that

furnish the basis of the suit], a court has insufficient data to dismiss a complaint for failure to

state a claim."  *Orlander v. Staples, Inc.*, 802 F.3d 289, 295 (2d Cir. 2015) (quoting *Eternity*

*Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.,* 375 F.3d 168, 178 (2d Cir. 2004))

(alterations in original); *see also Rounds v. Beacon Assocs. Mgmt. Corp.,* 2009 WL 4857622, at

*3 (S.D.N.Y. Dec. 14, 2009) ("Where there is no ambiguity to a contract and the intent of the

parties can be determined from the face of the agreement, interpretation is a matter of law, and a

claim turning on that interpretation may be resolved on a motion to dismiss.").

    "A contract term is unambiguous if it has 'a definite and precise meaning, unattended by

danger of misconception in the purport of the contract itself, and concerning which there is no

reasonable basis for a difference of opinion.'"  *Orlander*, 802 F.3d at 294–95 (quoting *Olin*

*Corp. v. Am. Home Assur. Co.,* 704 F.3d 89, 99 (2d Cir. 2012)).  "An ambiguity exists where the

terms of a contract could suggest 'more than one meaning when viewed objectively by a

reasonably intelligent person who has examined the context of the entire integrated agreement

and who is cognizant of the customs, practices, usages and terminology as generally understood

in the particular trade or business.'"  *Eternity Glob.*, 375 F.3d at 173 (quoting *Alexander &*

*Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London,* 136 F.3d 82, 86 (2d

Cir. 1998)); *see also Crowley*, 512 F. Supp. 2d at 152 ("Where the language used is susceptible

to differing interpretations, each of which may be said to be as reasonable as another, and where

there is extrinsic evidence of the parties' actual intent, the meaning of the words becomes an issue of fact . . . .") (quoting *Seiden Assocs.,* 959 F.2d at 428).

    **B.** **Application of the Standards to the Current Matter**

        **1.** **Nature of the SCA**

The parties disagree on the nature of their contractual relationship. According to Defendant, the SCA and the service orders are all separate, but interdependent contracts. Motion at 4. In Defendant's view, the SCA "set forth . . . general terms that would govern the parties' future transactions, including confidentiality obligations . . ., indemnification duties . . ., and the governing law" but did not "contain any price term; nor did it specify how much space NYI would rent to JobDiva or set forth all the services that NYI would provide to JobDiva." *Id.* The specifics of the initially agreed upon services were established by the October 2011 Order (appended to the SCA), which had a required two-year term. October 2011 Order at 1, 2. The executed SCA also had a two-year Initial Term running through October 24, 2013, which automatically renewed for successive one-year periods "unless a party g[ave] the other party written notice of its intention not to renew, at least 90 days prior to the expiration of the Initial Term or then current Renewal Term." SCA § 4.01. Accordingly, Defendant argues that it terminated the SCA in July 2016 with its Termination Letter, ending its obligations under that contract to Plaintiff as of October 24, 2016. Motion at 6. Defendant further contends that by its termination of the SCA and/or under their own terms, all "the service orders also terminated or expired in October 2016." Motion at 9.

In contrast, Plaintiff contends that the SCA itself was the renewal of a prior colocation agreement, that the parties renewed the SCA "by the terms of the Renewal Service Order dated October 30, 2013" (the October 2013 Order), and that they extended the term of the SCA again

"through and including September 24, 2017" by the Purported 2014 Addendum.  Complaint ¶¶

5–7.  The parties agree that the Purported 2014 Addendum contemplates extension of the SCA's

term, but disagree about the validity of such a modification.  In Plaintiff's view, the extension

revoked Defendant's annual termination right.  *See* Opposing Memo at 2–4; Opposing Affidavit

¶¶ 14–15.

Reading the plain text of the SCA and the service orders appended to the Complaint, the

Court concludes that the SCA can be most accurately characterized as an option contract.  "An

option contract is an agreement to hold an offer open; it confers upon the optionee, for

consideration paid, the right to [accept the offer] at a later date."  *Kaplan v. Lippman*, 75 N.Y.2d

320, 324–25 (1990) (quoting *Leonard v. Ickovic*, 433 N.Y.S.2d 499, 500 (App. Div. 2d Dep't.

1980)); *see also* Restatement (Second) of Contracts § 25 (1981) ("An option contract is a

promise which meets the requirements for the formation of a contract and limits the promisor's

power to revoke an offer.").  Under an option contract, the optionee has a unilateral right to later

exercise the option and ripen the agreement into a "fully enforceable bilateral contract."  *Kaplan,*

75 N.Y.2d at 325 (citing *Cochran v. Taylor,* 273 N.Y. 172, 183 (1937); *Bullock v. Cutting,* 140

N.Y.S. 686, 688–89 (3d Dep't 1913)).

Options are often embedded in leasing or rental contracts for real property, granting the

occupant a right to purchase the property during or at the end of the lease term.  In these cases,

the option is generally explicit and exchanged in consideration for, or as a part of, the initial

lease or rental transaction.  *See, e.g., Broadwall Am., Inc. v. Bram Will-El LLC*, 821 N.Y.S.2d

190, 191 (2006) (involving an option contract to purchase real property after an upfront premium

payment); *Kaplan*, 75 N.Y.2d at 323 (finding that a subtenant validly exercised an option

contained in its sublease agreement to purchase a coop unit); *Zora Realty Co. v. Green*, 62

N.Y.S.2d 679, 680 (N.Y. Mun. Ct. 1946) (involving the contemporaneous signing of a lease to

rent and option to purchase a dwelling and its furniture).  Securities option contracts are also

common and usually involve an upfront premium payment for the right to purchase specified

securities at a later date.  *See, e.g., Wells Fargo*, 32 F. Supp. 3d at 438–39 (involving a security

pooling agreement with an embedded option granting one of the parties to the trust the right to

purchase the underlying securities upon the occurrence of specified conditions).

The contract before this court is similar to the one at issue in *In re Hawker Beechcraft,*

*Inc.*, 2013 WL 2663193 (Bankr. S.D.N.Y. June 13, 2013).  In that case, the debtor had signed

two prepetition "master agreements" and hundreds of associated "purchase orders" with a

manufacturing counterparty over several years that, together, governed the construction and

purchase of certain aircraft components.  *Id.* at *1–2.  After filing bankruptcy, the debtor sought

to assume only a subset of the purchase orders under Section 365(a) of the Bankruptcy Code, and

the counterparty objected on the grounds that the master agreements and purchase orders were all

part of a single indivisible contract.  *Id.* at *2.  Looking to Kansas contract law, the court rejected

the counterparty's position and found instead that it was an option contract without the formal

label.  *Id.* at *5.  Like the case at hand, the parties in *Hawker Beechcraft* tied the signing of the

master contract to an initial transaction—there the selling of necessary tooling to the

manufacturing counterparty—and the debtor then "exercised the option and accepted [the

counterparty's] open offer each time it issued a Purchase Order . . . which include[d] a part

number, quantity and delivery date . . . ."  *Id.*  Finally, the court in *Hawker Beechcraft* observed

that different provisions of the master agreement conflicted regarding whether the manufacturing

counterparty was obligated to honor every purchase order or actually had authority to reject

them.  *Id.*  While such discretion might not jibe perfectly with the definition of an option

14

contract, the court found that the provision granted the authority to reject orders only under limited scenarios and that "in practice" the counterparty never rejected a purchase order.  *Id.*

Here, the parties executed the SCA together with the October 2011 Order.  Like *Hawker Beechcraft*, this established a bilateral initial transaction with an option for future orders.  *See also Mam Properties, LLC v. Omnipoint Commc'ns, Inc.*, 950 N.Y.S.2d 835 (App. Term 2010) (option contract involving payment of an initial fee for the option to later elect to lease space for installation and operation of telecommunication equipment).  The SCA established the form for those orders and the general contract terms applicable to future service orders.  The SCA also established an obligation for Plaintiff to maintain and provide certain facilities over the term of the SCA with the Defendant having the option to install and operate its server equipment under subsequently executed service orders.  The SCA mandated that NYI "shall provide and maintain" the facility "in good working order at all times" and provide Defendant with space "for the purposes of connecting [Defendant's] server to the Internet through the NYI Local Area Network."  SCA § 2.01(a).  The Defendant was granted a "non-exclusive license to access portion s [sic] of the Facility and to use the portion of the Facility in which the Customer's Equipment is located solely (i) to accommodate Customer's equipment, and (ii) to install, maintain and operate Customer's Equipment therein."  SCA § 2.02(a).  The SCA further stated that upon termination or expiration of a service order, Defendant "shall immediately quit and peacefully surrender the applicable Portion of the Facility in which [Defendant's] Equipment is located . . . ."  SCA § 2.03.  These terms strongly suggest that the service orders cover and comprise the entirety of the scope of Defendant's actual use of any of Plaintiff's space or services.  When later detailing the scope of any rights grantable under a service order, the SCA also referred to the orders as individual agreements for the provision of services.  SCA § 2.04.

Finally, in discussing the fees to be paid by Defendant, the SCA explicitly contemplated the signing of a new service order to re-set power fee structures if necessary depending on the level of Defendant's usage.  SCA § 3.04.[6]

The SCA, like the master agreement in *Hawker Beechcraft*, also included potentially conflicting language when referring to the scope and negotiability of service orders.  The SCA introduced the term service order initially only in reference to the "installation, maintenance and disconnection of [Defendant's] Equipment," and carved out NYI's discretion over whether to provide such services upon the Defendant's request.  SCA § 2.01(c).  But its base obligations were not negotiable and, like in *Hawker Beechcraft*, the Court has been presented with no allegation that NYI ever actually rejected a service order.

### 2.   Defendant Contests the Purported 2014 Addendum

Having established the nature of the SCA, the Court turns to the parties' disagreement over whether the SCA was terminated.  *See* Motion at 8–10.  Plaintiff argues that the SCA was modified by the Purported 2014 Addendum to extend the contract term, thus removing Defendant's right to terminate in that fashion.  *See* Opposing Memo at 2–4; Opposing Affidavit ¶¶ 14–15.  Defendant denies that the modification was validly executed, relying on the two

---

[6]     Plaintiff's explanation for the SCA and related service orders is implausible and runs contrary to the plain text of the documents.  Plaintiff's view requires that separately drafted contracts with explicitly different terms and substance overlap with and replace each other in an irreconcilable fashion.  Moreover, Plaintiff's argument that each order replaced or renewed the prior orders runs afoul of its own Invoices, which separately itemize service charges under several different order numbers at once.  Complaint Ex. H; *see OBG Tech. Servs., Inc.*, 503 F. Supp. 2d at 516 ("[T]he Court concludes that the clear and unambiguous terms of the [contract] cannot reasonably be read to [support the position] asserted in the [complaint].  Therefore, the Court grants [defendant's] motion to dismiss [the] breach of contract claim . . . .").

But even if the SCA is not viewed as an option contract, there is still nothing in it that establishes any obligation on the part of Defendant to pay for a certain level of service from NYI, or that requires the execution of any particular service orders beyond the October 2011 Order.  Therefore, whether the Court views the SCA as an option contract, or simply interprets each service order as a new, independently negotiated contract, the result here is the same.  Under either paradigm, the service orders are the contractual components which provide for the actual payment and performance obligations, not the SCA.

signature requirement in SCA Section 8.08, which states that the contract "may be modified only by a written agreement of modification signed by all of the parties hereto." SCA § 8.08; Motion at 8–10. Defendant claims that because only it signed the Purported 2014 Addendum, that document cannot have extended the term of the SCA or altered the annual termination right. Motion at 8–10. Plaintiff argues that certain separate writings and the parties' course of conduct either (1) fully satisfied the SCA clause or (2) waived the clause. *See* Opposing Memo at 6, 7 (citing New York case law and collection of signed and unsigned writings relating to the same transaction).

New York case law provides guidance on this exact issue. "Where a contract provides a procedure for amending contract provisions, that procedure must be followed to execute a valid amendment." *BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 778 F. Supp. 2d 375, 411–12 (S.D.N.Y. 2011) (strictly enforcing dual requirements that modifications be in writing and signed by all parties and that they be accompanied by certain related rating agency commitments) (citing *Deutsche Bank AG v. JPMorgan Chase Bank*, 2007 WL 2823129, at *23–*24 (S.D.N.Y. Sept. 27, 2007); *John St. Leasehold LLC v. F.D.I.C.*, 196 F.3d 379, 382 (2d Cir.1999)). But where the contract's restrictions are only that modifications be signed and in writing, New York law does permit noncompliant modifications under certain conditions. First, "where it is provided that modifications must be in writing and signed, New York will enforce oral modifications in two circumstances—where there has been (1) partial performance or (2) reliance—but only where the subsequent performance or reliance is 'unequivocally referable to the modification.'" *John St. Leasehold LLC*, 196 F.3d at 382 (quoting *Towers Charter & Marine Corp. v. Cadillac Ins. Co.,* 894 F.2d 516, 522 (2d Cir. 1990)); *see Gerard v. Cahill*, 2008 WL 3409402, (Sup. Ct. Suffolk Cty.) ("It is well settled that . . . the alleged partial performance must

be unequivocally referable to said oral modification and must evidence an indisputable material departure from the written agreement").  Second,

> a subsequent written amendment or modification, . . . may be effective if signed by the party against whom enforcement is sought . . . . The fact that the original agreement requires that amendments or modifications be signed by *all* of the parties to the original agreement is not dispositive if the evidence, taken as a whole, shows that the amendment was authentic or was otherwise ratified by the parties' conduct.

*Karel v. Clark*, 514 N.Y.S.2d 766, 767 (App Div. 2d Dep't. 1987) (citations omitted)); *see also Kuhns v. Clayton*, 1990 WL 177494, at *1 (Sup. Ct. N.Y. Cty. May 29, 1990) (stating that a contract merger clause which allowed for modification "only in a writing signed by both parties" is not dispositive because "General Obligations Law § 15-301(1) authorizes the modification of a written instrument merely by a writing signed by the party against whom enforcement is sought.") (citations omitted).

Moreover, New York law provides that, "[a] breach of contract may be waived by the non-breaching party."  *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 585–86 (2d Cir. 2006) (citations omitted).  "Contractual rights may be waived if they are knowingly, voluntarily and intentionally abandoned."  *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.,* 7 N.Y.3d 96, 104 (2006) (citing *Nassau Trust Co. v. Montrose Concrete Prods. Corp.,* 56 N.Y.2d 175, 184 (1982)).  Waiver "is essentially a matter of intent which must be proved."  *Beth Israel*, 448 F.3d at 585 (quoting *Jefpaul Garage Corp. v. Presbyterian Hosp.,* 61 N.Y.2d 442, 446 (1984)).

Applying these principles here, the Court finds that it cannot resolve the validity of the Purported 2014 Addendum on the present Motion.  While Defendant is correct that Section 8.08 of the SCA provides that the consent may only be modified by a written agreement signed by all parties (*see* SCA § 8.08), the Purported 2014 Addendum was signed by JobDiva, the party

18

against whom enforcement is being sought (*see* Purported 2014 Addendum).  Moreover, SCA

Section 8.03 also allows a waiver of other SCA provisions—such as Section 8.08—as long as the

waiving party provides consent in writing.  *See* SCA § 8.03.

Plaintiff's two arguments in support of the validity of the extension are necessarily fact-

intensive.  First, Plaintiff offers up the email correspondence appended to the Opposing Affidavit

as additional "writings" to demonstrate a meeting of the minds regarding the modification, and

consideration for the extension in the form of "discounts and credits against past due bills."

Opposing Memo at 7.  But as discussed extensively above, the Court cannot consider the emails

appended to the Opposing Affidavit as they were not attached to, incorporated by reference in, or

integral to the Complaint.  *See Clopay Plastic*, 2013 WL 6388444, at *2.

Second, Plaintiff argues that the parties' course of conduct confirms that the contract was

validly modified.  Plaintiff maintains that the single signature on the Purported 2014 Addendum

was in line with the parties' course of conduct over the lifetime of the SCA.  In fact, except for

the October 2011 Order, *every single service order* appended to the Complaint was not signed by

Defendant; rather, each one was only signed by the same representative of the Plaintiff (Gene

Liu), or by *no one at all.  See* Complaint Exs. B–E; *c.f. Indus. Window Corp. v. Fed. Ins. Co.*,

609 F. Supp. 2d 329, 342–43 (S.D.N.Y. 2009) (denying summary judgment on claims for

payment for "extra work" under construction job where contractual provisions forbade

modifications without a written change order, because "New York courts routinely hold that 'the

general course of conduct between the parties[ ] may modify or eliminate contract provisions

requiring written authorization or notice of claims.'") (quoting *Barsotti's, Inc. v. Consolidated

Edison Co.,* 680 N.Y.S.2d 88, 89 (App. Div. 1st Dep't 1998)) (alteration in original).  Defendant

has not argued that any of these service orders were invalid, nor has either party indicated that

Defendant ever failed to perform under these service orders prior to its attempted termination of the SCA in 2016. Plaintiff further argues that "the documentary evidence demonstrates [that] JobDiva[] accepted the benefits of the three year extension of the Server Colocation Agreement for approximately two of the three years of the renewal term."[7] Opposing Memo at 7.

Given the fact intensive arguments raised by Plaintiff and the service orders attached to the Complaint, the Court cannot, at this stage, dismiss the action based on a termination of the SCA. *See Cohen v. Gerson Lehrman Grp., Inc.*, 686 F. Supp. 2d 317, 324 (S.D.N.Y. 2010) (denying a Rule 12(b)(6) motion attacking, among other things, plaintiff's adequacy as a class representative because a "more complete factual record would facilitate" resolution of the arguments); *id.* at 325 (denying a fact-reliant motion to dismiss certain counterclaims where "[n]either party urges that the motion . . . be converted into one for summary judgment . . ."); *Bakeer v. Nippon Cargo Airlines, Co.*, 2011 WL 3625103, at *29 (E.D.N.Y. July 25, 2011) (denying a motion to dismiss an employment discrimination action because it is "a fact intensive inquiry" and "more appropriately considered after discovery . . .").

### 3.  **Defendant Contests Pleading of Damages**

The Court next turns to Defendant's argument that even if the SCA was validly modified to extend through September 2017, Plaintiff has not sufficiently pled the existence of damages. Plaintiff's damages calculation assumes that—because the Purported 2014 Addendum extended the SCA term through September 2017—the payments due under the service orders in October 2016 would have continued for the subsequent 11 months. *See* Complaint ¶¶ 13–17, 23–25, at 5; *id.* Ex. H. Thus, Plaintiff's damages claim under its first cause of action is the sum of the

---

[7]      This statement alone would not have carried much weight as the facts would be identical due to the auto-renewal provision in the SCA unless a party exercised the termination option.

Invoices sent in October, November, and December, and its damages claim under the second

cause of action is the same invoiced charge multiplied to include the 8 remaining months. *See*

Complaint ¶¶ 13–17, 23–25, at 5.

Defendant counters that the service orders which set those charges all either expired by

their own terms, or were properly terminated by the Termination Letter. *See* Motion at 9–10.

The Court largely agrees. As discussed above, the SCA operated as an option contract, allowing

Defendant to request new service orders as necessary. The service orders alone actually

establish performance or payment obligations. Thus, the service orders determine the duration of

any contractual obligations that exist and any corresponding damages claimed for breach. The

service orders here vary both as to their obligations and the length of their terms. *See, e.g.,*

October 2013 Order (stating: "36 Month Contract Required"); Complaint Ex. E at 1 (presenting a

"Month to Month Term"); *id.* at 11 (itemizing "Monthly Recurring Charges" but identifying no

term); *see also* Motion at 12 ("Further, from October 2011 to April 2016, the parties entered into

more than a dozen service orders, which contained different terms that (if read as one agreement)

would conflict.").

While the SCA requires 90 days' notice for its termination, neither the SCA nor the

service orders place any restrictions on a party's ability to terminate a service order except for

the order's stated term duration. *See* SCA § 2.03 (referring to service orders terminating at

NYI's option or expiring by their term). The majority of the service orders referenced by the

Invoices—though not the majority of the charge values—were identified as month-to-month or

left without any specific term. Under New York law, month-to-month contracts are terminable

with notice by either party as of the end of any given month. *Genesis Office Sys., Inc. v.*

*Gestetner/Savin Corp.*, 2008 WL 313934, at *3 (S.D.N.Y. Feb. 5, 2008) (finding no breach

where a party terminated a month-to-month contract by providing more than the contractually

required 30-day notice) (citing *DCMR v. Trident Precision Mfg.*, 317 F.Supp. 2d 220 (W.D.N.Y.

2004) (finding no breach for termination of an at will employment agreement in compliance with

the 30-day written notice)); *see also United Aluminum Corp. v. Boc Grp., Inc.*, 2009 WL

2589486, at *6 (D. Conn. Aug. 21, 2009) (analyzing a contract which contrasts an initial period

with an explicit expiration date and a subsequent month-to-month term); *Quigley v. City of

Syracuse*, 2006 WL 2827884, at *1 (N.D.N.Y. Sept. 29, 2006) (discussing a contract which

reached the end of an initial 11–month term and was then renewed on a month-to-month basis);

*Int'l Shoppes, Inc. v. Holder*, 1999 WL 993719, at *5 (E.D.N.Y. Sept. 6, 1999) (referencing a

month-to-month contract which could be terminated "at any time on thirty days' notice").

Alternately, "[c]ontracts containing no definite term of duration are terminable at will."

*Bennett v. Atomic Prod. Corp.*, 18 N.Y.S.3d 443, 445 (App. Div. 2d Dep't. 2015) (citing *Better

Living Now, Inc. v. Image Too, Inc.*, 889 N.Y.S.2d 653, 655 (App. Div. 2d Dep't. 2009); *Double

Fortune Prop. Inv'rs Corp. v. Gordon*, 866 N.Y.S.2d 111, 112 (App. Div. 1st Dep't. 2008) ("The

escrow agreement contained no definite term and therefore was terminable at will."); *Interweb,

Inc. v. iPayment, Inc.*, 783 N.Y.S.2d 468, 468 (App. Div. 1st Dep't. 2004) (A credit card

payment processing agreement "failed to contain a term certain for its duration . . . [and thus]

was terminable at will . . . .")); *see also Lipton v. Green*, 2016 WL 1452143, at *5 (Sup. Ct. N.Y.

Cty. 2016).

Applying these principles here, the Court finds that all service orders identified as month-

to-month or without terms as to duration were properly terminated in October 2016 by

Defendant's Termination Letter, whether or not it was successful in terminating the SCA.

The Invoices referenced only three other service orders, which all contemplated specific durations. *See* Complaint Exs. H, J, K. Only one of these service orders has a term that explicitly extended beyond the purported termination date of October 2016. *See* Complaint Ex. H at 3 ("Order # Q81-87-5515"); *id.* Ex. J at 3 (same); *id.* Ex. K at 3 (same). This service order was signed in March 2015 and included a 24 month term with "Monthly Recurring Charges" of $750. Complaint Ex. E at 17. Therefore, as of the attempted termination date, this service order had remaining payment obligations on its face of up to $3,750 and cannot be found to have terminated by virtue of the Defendant's Termination Letter.

The final two service orders—the October 2011 Order ("Q36-97-8871") and the October 2013 Order ("Q46-40-6385")—comprised the vast majority of the dollar value obligations. Complaint Exs. H, J, K. These two orders listed "Required" contract lengths that expired prior to or contemporaneous with the purported termination date in October 2016. Complaint Exs. B, C. On this record, it is unclear whether the use of a "Required" duration established an explicit term limit to the contract, or anticipated conversion to a month-to-month contract following expiration of the listed duration.[8] But in any event, for the reasons discussed above, any damages under these two service orders would appear to be modest given the Defendant's Termination Letter of October 2016.

In sum, the Court finds that Plaintiff has sufficiently plead the existence of at least one continuing payment obligation through at least March 2017 and perhaps two more. But

---

[8]    In fact, the "Required" term of the October 2011 Order expired around the end of 2013, and the monthly itemized charges associated with it on the Invoices only sum to just over $4,000, well below the $43,000 in "Recurring Fees" listed on the October 2011 Order. Complaint Exs. H, J, K. The parties do not address this discrepancy, but the Court need not explore further, having found that at least one service order extended beyond October 2016.

significantly, it appears that the surviving Complaint contains a much smaller claim for damages than the total of approximately $1.3M asserted in the Complaint.  Complaint ¶¶ 24–25, at 5.

## <u>CONCLUSION</u>

The Court grants in part and denies in part Defendant's Motion.  Plaintiff is directed to settle an order on seven days' notice.  The proposed order must be submitted by filing a notice of the proposed order on the Case Management/Electronic Case Filing docket, with a copy of the proposed order attached as an exhibit to the notice.  A copy of the notice and proposed order shall also be served upon counsel to the Defendant.  Given the Court's assessment of the nature of the SCA and the ruling on the scope of damages, the parties shall schedule a status conference within 30 days of the date of this Decision to discuss the status of the case and the best way to proceed forward.

Dated: New York, New York
     April 13, 2018


                                */s/ Sean H. Lane*
                                UNITED STATES BANKRUPTCY JUDGE